IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
| | : | |
| v. | : | **VIOLATIONS:** |
| **SCHLUMBERGER OILFIELD** | : | **18 U.S.C. § 371** |
| **HOLDINGS, LTD.,** | : | **(Conspiracy to Violate the** |
| | : | **International Emergency** |
| Defendant. | : | **Economic Powers Act)** |
| | : | |
| | : | **50 U.S.C. §§ 1701-05** |
| | : | **(International Emergency** |
| | : | **Economic Powers Act)** |
| | : | |
| | : | **31 C.F.R. § 560 (Iranian** |
| | : | **Transactions Regulations)** |
| | : | |
| | : | **31 C.F.R. § 538 (Sudanese** |
| | : | **Sanctions Regulations)** |
| | : | |
| | : | **FORFEITURE:** |
| | : | **18 U.S.C. § 981(a)(1)(C)** |
| | : | **28 U.S.C. § 2461(c)** |

## INFORMATION

The United States Attorney charges that:

## COUNT ONE

**(Conspiracy to Violate the International Emergency Economic Powers Act)**

At all times material to this Information:

### The Defendant

1.      Schlumberger Oilfield Holdings, Ltd. ("SOHL") was a subsidiary of Schlumberger Ltd. ("Schlumberger")—one of the largest oilfield services organizations in the world. SOHL was incorporated in the British Virgin Islands and Schlumberger Ltd. was incorporated in The Netherlands Antilles/Curaçao and maintained a headquarters in Paris, France; Houston, Texas; and The Hague, Netherlands.

2.      Drilling & Measurements ("D&M") was a Schlumberger business segment that provided oilfield drilling and measurement technology and services to oilfield locations all over the world. D&M headquarters was located in Sugar Land, Texas. Non-U.S. subsidiaries of SOHL provided D&M services to customers based in Iran and Sudan. D&M employees, who were based in the Sugar Land, Texas headquarters, had worldwide responsibility for developing D&M's technology line and working with oilfield personnel, who were responsible for deploying the D&M technology in the form of oilfield services they provided to customers.

3.      At no time did Schlumberger, including SOHL and D&M, apply for, receive, or possess the requisite license or authorization from the United States Department of the Treasury's Office of Foreign Asset Control ("OFAC"), located in the District of Columbia, for any of the prohibited conduct set forth below.

2

## General Allegations

### The International Emergency Economic Powers Act

4.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, gave the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. IEEPA controls were triggered by an Executive Order declaring a national emergency based on an "unusual and extraordinary threat, which had its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain practices and transactions with respect to various sanctioned nations by U.S. persons or involving U.S.-origin goods.

5.      Pursuant to IEEPA, 50 U.S.C. § 1705, it was a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

### Iranian Transactions Regulations

6.      On March 15, 1995, the President issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and … declare[d] a national emergency to deal with that threat."

7.      On May 6, 1995, the President issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and to impose comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other

3

things, the exportation or reexportation to Iran or the Government of Iran of any goods, technology, or services from the United States.

8.      On August 17, 1997, the President issued Executive Order 13059 consolidating and clarifying Executive Orders 12957 and 12959 (collectively, "Executive Orders").      In addition to the prohibitions contained in Executive Orders 12957 and 12959, Executive Order 13059 prohibited the exportation, reexportation, sale, or supply, directly or indirectly from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran.      This prohibition included the exportation, reexportation, sale, or supply of goods, technology, or services to a person in a third country with knowledge or reason to know that such goods, technology, or services were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran.      The Executive Orders authorized the United States Department of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.      Pursuant to this authority, the Secretary of the Treasury issued the Iranian Transactions Regulations ("ITR"), subsequently renamed the Iran Transactions and Sanctions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

9.      With certain limited exceptions, the ITR prohibited the export of goods, technology, or services from the United States or by a United States person to Iran without obtaining a license from OFAC.      The ITR defined "United States person" as United States citizens, permanent resident aliens, and any persons in the United States.      The ITR also prohibited the facilitation by United States persons of transactions involving Iran or the Government of Iran. The ITR further prohibited any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions of the ITR.

10.     The ITR imposed, among others, the following prohibitions:

**Section 560.203 – Evasions; attempts.**

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

**Section 560.204 – Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.**

Except as otherwise authorized [by OFAC] . . ., the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

**Section 560.206 – Prohibited trade-related transactions with Iran; goods, technology, or services.**

(a) Except as otherwise authorized [by OFAC] . . . no United States person, wherever located, may engage in any transaction or dealing in or related to:

(1) Goods or services of Iranian origin or owned by the Government of Iran; or

5

> (2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.
>
> (b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

## Section 560.208 – Prohibited facilitation by United States persons of transactions by foreign persons.

> Except as otherwise authorized [by OFAC] . . . no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

### Sudanese Sanctions Regulations

11.     On November 3, 1997, the President issued Executive Order 13067, finding that "the policies and actions of the Government of Sudan, including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States," and declaring a national emergency to deal with that threat.

12.     Executive Order 13067 imposed a comprehensive trade embargo against Sudan and authorized the Secretary of the Treasury to promulgate rules and regulations to carry out the purposes of the Executive Order. To implement Executive Order 13067, the Secretary of the Treasury issued the Sudanese Sanctions Regulations ("SSR"), 31 C.F.R. Part 538.

13.     With certain limited exceptions, the SSR prohibited the export of goods, technology, or services from the United States or by a United States person to Sudan without

6

first obtaining a license from OFAC. Similar to the ITR, the SSR defines "United States person" as United States citizens, permanent resident aliens, and any person in the United States. The SSR also prohibited the facilitation by United States persons of the export or reexport of goods, technology, or services to Sudan from any location. The SSR further prohibited any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions of the SSR.

14.     The SSR imposed, among others, the following prohibitions:

**Section 538.205 – Prohibited exportation and reexportation of goods, technology, or services to Sudan.**

Except as otherwise authorized, the exportation or reexportation, directly or indirectly, to Sudan of any goods, technology (including technical data, software, or other information) or services from the United States or by a United States person, wherever located, or requiring the issuance of a license by a Federal agency, is prohibited.

**Section 538.206 – Prohibited facilitation.**

Except as otherwise authorized, the facilitation by a United States person, including but not limited to brokering activities, of the exportation or reexportation of goods, technology, or services from Sudan to any destination, or to Sudan from any location, is prohibited.

**Section 538.210 – Prohibited transactions relating to petroleum and petrochemical industries.**

(a) Except as otherwise authorized . . . all transactions by United States persons relating to the petroleum or petrochemical industries in Sudan, including, but not limited to, oilfield services and oil or gas pipelines, are prohibited.

(b) Except as otherwise authorized, the facilitation by a United States person, including but not limited to brokering activities, of

7

any transaction relating to the petroleum or petrochemical industries in Sudan is prohibited.

### Section 538.211 – Evasions; attempts; conspiracies.

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this part is prohibited. Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is prohibited.

#### The Conspiracy

15.     Beginning at least as early as February 2004, and continuing until at least June 30, 2010, in the District of Columbia and elsewhere, the defendant, SOHL, did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to commit offenses against the United States, that is, to facilitate trade with Iran and Sudan, to illegally export and cause the export of services to Iran and Sudan, and to engage in transactions to evade or avoid the prohibitions of the ITR and SSR, all without having first obtained the required licenses and authorizations from OFAC, in violation of Title 18 United States Code, Section 371; Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 31, Code of Federal Regulations, Part 538.

### Objects of the Conspiracy

16.     The objects of the conspiracy were the following:

    a. To expand Schlumberger, SOHL, and D&M operations in Iran and Sudan which resulted in an increase of profit and revenue for D&M, and ultimately Schlumberger.

    b. To continue providing D&M technical services and expertise to support D&M operations in Iran and Sudan in order to maintain D&M's efficiency and

8

operability in these markets which ultimately facilitated trade with Iran and Sudan.

c. To evade the prohibitions and licensing requirements of the ITR and SSR in order to initiate and continue SOHL and D&M's profitable oilfield-related activities in Iran and Sudan unabated.

## Manner and Means of the Conspiracy

17.     Subsidiaries of SOHL negotiated and entered into agreements with Schlumberger customers located in Iran and Sudan to provide oilfield services to these customers. These efforts caused certain specialized oilfield drilling equipment to be manufactured and exported to embargoed locations.

18.     Consequently, D&M personnel located in the United States actively facilitated SOHL's business operations in Iran and Sudan and took specific steps designed to maximize D&M's efficiency and profitability in these markets.

## Overt Acts

19.     In furtherance of the above-described conspiracy, and to achieve the objects and purposes thereof, SOHL, in particular D&M, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

> (a) In March 2004, D&M headquarters personnel in the United States unlawfully facilitated business with Iran by directing the export of oilfield drilling equipment from Canada to Iran in support of an oilfield services contract with *inter alia* the National Iranian Oil Company. In internal company communications, D&M personnel referred to Iran as "Northern Gulf," a code word used by D&M employees to avoid direct reference to Iran.

9

(b) In July and August 2004, D&M personnel in the United States provided technical services related to the testing of "mud," a substance used to lubricate oilfield drilling equipment while in operation, taken from oil wells in Sudan; D&M personnel used the term "Southern Egypt" as a substitute for Sudan in internal company communications.

(c) In March 2006, D&M personnel in the United States approved a request from D&M personnel in Sudan to spend $660,000 in order to improve its oilfield base infrastructure.   In internal company communications regarding this unlawful approval, D&M personnel referred to Sudan as "Southern Egypt."

(d) In December 2007, D&M personnel located in Iran were instructed by D&M personnel outside the United States to disguise orders for newly-manufactured oilfield drilling equipment from D&M management personnel in the United States by utilizing a location code for a non-embargoed location "since US/European people cannot approve [Iran] orders."

(e) In February 2008, D&M personnel facilitated a "swap" of a D&M tool manufactured in the U.S. for the benefit of D&M operations in Iran, whereby D&M personnel directed non-embargoed countries to swap used drilling equipment with new drilling equipment from the United States and then export the identical used equipment to Iran.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

20.    The violation alleged in Count One of this Information is re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

21.    Upon conviction of the offense set forth in Count One of this Information, SOHL shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly, as a result of the offense alleged in Count One. The property to be forfeited includes

a personal money judgment in the amount of $77,569,452.

22.    If any of the property subject to forfeiture, as a result of the offense alleged in Count One of this Information:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty,

The United States of America shall be entitled to forfeiture of substitute property pursuant to Title 28, United States Code, Section 2461(c), as incorporated by Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the property subject to forfeiture.

11

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

Maia Luckner Miller
VA Bar No. 73221
(202) 252-6737
Maia.Miller@usdoj.gov
Zia M. Faruqui
DC Bar No. 494990
(202) 252-7117
Zia.Faruqui@usdoj.gov
Assistant United States Attorneys

JOHN P. CARLIN
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

Casey Arrowood
D.C. Bar 996381
(202) 233-2259
Casey.Arrowood@usdoj.gov
Trial Attorney
National Security Division

3/25/15
DATE

12