CR 15-41 (JDB)

**FILED**

APR 30 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## STATEMENT OF OFFENSE

### Introduction

1. This Factual Statement is made pursuant to, and is part of, the Plea Agreement dated 3/25/2015, between the United States Attorney's Office for the District of Columbia and the National Security Division of the United States Department of Justice (collectively, "DOJ") and Schlumberger Oilfield Holdings, Ltd. ("SOHL"), a subsidiary of Schlumberger Ltd. (collectively "Schlumberger"). At all relevant times, Schlumberger, including its subsidiaries, business segments, and affiliates, was one of the largest oilfield services organizations in the world.

2. At all relevant times, Drilling & Measurements ("D&M") was a Schlumberger business segment that provided oilfield drilling and measurement technology to oilfield locations all over the world. D&M was headquartered in Sugar Land, Texas. From an operational standpoint, SOHL and its non-U.S. entity subsidiaries provided D&M services to Schlumberger customers in Iran and Sudan.

3. Starting in February 2004 and continuing through June 2010 (the "relevant time period"), D&M violated U.S. law by facilitating transactions with Iran and Sudan and by exporting, and causing the export of, services to Iran and Sudan, in violation of U.S. economic sanctions. This conduct occurred in several locations throughout D&M, including its headquarters in the United States, with the direct involvement, knowledge, approval, and encouragement of D&M management personnel. D&M also engaged in transactions and implemented processes intended to evade the prohibitions on such conduct. Unless otherwise noted, the information presented below relates to the relevant time period.

1

4. Although it was lawful for SOHL, a non-U.S. entity, to operate in Iran and Sudan under certain circumstances, and although SOHL, as a subsidiary of Schlumberger, had policies and procedures designed to ensure that the company did not violate U.S. economic sanctions, Schlumberger failed to train its employees adequately to ensure that all company U.S. persons, including non-U.S. citizens who resided in the U.S. while employed by D&M, fully complied with Schlumberger's policies and procedures assuring compliance with U.S. economic sanctions. As a result, D&M, through the participation of U.S. persons as defined by the sanctions regimes described below, violated U.S. sanctions with Iran and Sudan by: (1) systematically approving and disguising capital expenditure requests from Iran and Sudan for the manufacture of new tools and for the spending of money for certain purchases, (2) directing the intra-segment transfer of oilfield drilling equipment from oilfields in non-embargoed locations to oilfields in Iran and Sudan, (3) making and implementing business decisions specifically concerning Iran and Sudan, and (4) providing certain technical services in order to troubleshoot mechanical failures and to sustain sophisticated oilfield drilling equipment in Iran and Sudan.

5. During the relevant time period, D&M generated approximately $77,569,452 related to this unlawful conduct.

### Schlumberger's Business Organization

6. During the relevant time period, Schlumberger Ltd. was incorporated in Curaçao and maintained a headquarters in Paris, France; Houston, Texas; and The Hague, Netherlands. In 2010, Schlumberger generated $27.45 billion in revenue.

7. SOHL was a Schlumberger subsidiary incorporated in the British Virgin Islands.

8. Schlumberger's operational structure had three organizational units: (1) the Area locations, (2) within each Area, the Geomarket locations, and (3) within each Geomarket, the

Field locations. The Field location was the smallest geographic unit. Typically, several Field locations were combined into a Geomarket. Several Geomarkets made up geographic Areas.

9. Iran functioned as its own Geomarket. For much of the relevant time period, Sudan was part of the Geomarket that also included Egypt, Jordan, and Syria. Later, Sudan became its own Geomarket. These Geomarkets, along with others, combined to form the Middle East and Asia Area ("MEA").

10. D&M personnel based in its Sugar Land headquarters had worldwide responsibility for developing the technology line and working with the Area, Geomarket and Field personnel, who were responsible for deploying the technology in the form of oilfield services they provided to customers. D&M headquarters personnel based in Sugar Land, including senior D&M management, were United States persons as defined in the sanctions regimes described below.

11. At the Area and Geomarket levels, D&M personnel, including senior D&M management, were responsible for D&M operations and asset distribution at the Area and Geomarkets, respectively.

12. D&M equipment was manufactured at the Sugar Land Product Center ("SPC") located in Sugar Land, Texas, the Stone House Technology Center ("SHTC") located in the United Kingdom, and the Schlumberger Riboud Product Center ("SRPC") located in France. Many D&M repair facilities and trained technicians were located outside the United States. In some cases, however, the most sophisticated expertise regarding a particular tool would be found at the product center that manufactured that tool. For example, D&M personnel providing oilfield services would rely on SPC at times for certain technical services related to the oilfield drilling tools manufactured at SPC.

3

### Applicable Law

<u>The International Emergency Economic Powers Act</u>

13. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, gave the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. IEEPA controls were triggered by an Executive Order declaring a national emergency based on an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain practices and transactions with respect to various sanctioned nations by U.S. persons or involving U.S.-origin goods.

14. Pursuant to IEEPA, 50 U.S.C. § 1705, it was a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

<u>Iranian Transactions Regulations</u>

15. On March 15, 1995, the President issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and ... declare[d] a national emergency to deal with that threat."

16. On May 6, 1995, the President issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and to impose comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other

things, the exportation or reexportation to Iran or the Government of Iran of any goods, technology, or services from the United States.

17. On August 17, 1997, the President issued Executive Order 13059 consolidating and expanding upon Executive Orders 12957 and 12959 (collectively, "Executive Orders"). In addition to the prohibitions contained in Executive Orders 12957 and 12959, Executive Order 13059 prohibited the exportation, reexportation, sale, or supply, directly or indirectly from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran. This prohibition included the exportation, reexportation, sale, or supply of goods, technology, or services to a person in a third country with knowledge or reason to know that such goods, technology, or services were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran. The Executive Orders authorized the United States Department of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury issued the Iranian Transactions Regulations ("ITR"), later renamed the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560.[1]

18. The ITR prohibited the facilitation by United States persons of virtually any transaction involving Iran or the Government of Iran without obtaining a license from OFAC. The ITR also prohibited the export of goods, technology, or services from the United States or by a United States person to Iran, with only limited exceptions. The ITR further prohibited any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions of the ITR.

---

[1] On October 22, 2012, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") changed the heading of the "Iranian Transactions Regulations" to the "Iranian Transactions and Sanctions Regulations," amended the renamed ITSR, and reissued them in their entirety. The prohibited activities set forth herein were in effect under the ITR and remain in full force and effect under the ITSR.

19. The ITR defined "United States person" as United States citizens, permanent resident aliens, and any persons in the United States.

20. The ITR were in effect during the relevant time period and at no time did Schlumberger or any of its subsidiaries, business segments, or affiliates, including D&M, apply for, receive, or possess a license from OFAC, located in Washington, D.C., for the conduct described below.

### Sudanese Sanctions Regulations

21. On November 3, 1997, the President issued Executive Order 13067, finding that "the policies and actions of the Government of Sudan, including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States," and declaring a national emergency to deal with that threat.

22. Executive Order 13067 imposed a comprehensive trade embargo against Sudan and authorized the Secretary of the Treasury to promulgate rules and regulations to carry out the purposes of the Executive Order. To implement Executive Order 13067, the Secretary of the Treasury issued the Sudanese Sanctions Regulations ("SSR"), 31 C.F.R. Part 538.

23. The SSR generally prohibited the facilitation by United States persons of the export or reexport of goods, technology, or services to Sudan from any location without obtaining a license from OFAC. The SSR also prohibited the export of goods, technology, or services from the United States or by a United States person to Sudan. The SSR further prohibited any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions of the SSR.

24. The SSR defined "United States person" as United States citizens, permanent resident aliens, and any persons in the United States.

25. The SSR were in effect during the relevant time period and at no time did Schlumberger or any of its subsidiaries, business segments, or affiliates, including D&M, apply for, receive, or possess a license from OFAC, located in Washington, D.C., for the conduct described below.

**Schlumberger's Trade Control and Compliance Program During Relevant Time Period**

26. As a non-U.S. entity, it was lawful for SOHL to operate in Iran and Sudan so long as U.S. persons were not involved in those operations. In an effort to assure compliance with U.S. sanctions prohibitions on the facilitation of trade with Iran and Sudan by U.S. persons, Schlumberger had policies and procedures in effect during the relevant time period that were designed to assure that company personnel who were U.S. persons did not participate in business that related to U.S. sanctioned countries, including a Recusal Program whereby U.S. persons were required to recuse themselves from involvement in business related to Iran and Sudan. However, Schlumberger failed to effectively enforce those policies and procedures in certain systems and practices important to D&M's operation in Iran and Sudan. In addition, Schlumberger failed to provide adequate compliance training and supervision of D&M personnel, regardless of citizenship, who occupied D&M positions located in the U.S. These failures gave rise to certain of D&M's willful conduct in violation of U.S. sanctions, as described below.

**Capital Expenditure Process**

27. One of the important functions of D&M management personnel was the supervision of D&M's capital expenditure process ("CAPEX"). The CAPEX was a forecasting

7

mechanism enabling oilfield locations and manufacturing facilities to predict what tools and equipment would be needed in the future to meet anticipated demand for oilfield services. D&M management at the Areas collected the forecasts from each Geomarket for submission to D&M headquarters. D&M headquarters reviewed the forecasts for each Geomarket, directed changes to the forecasts as necessary, consolidated the forecasts from the Areas, and ultimately submitted a total D&M CAPEX plan to Schlumberger management for approval. Once the annual CAPEX plan was approved, D&M managers at the Area and Geomarket levels entered requests seeking approval for the manufacture of new equipment as well as approval to spend money over a predetermined threshold for large-scale purchases.[2]

28. CAPEX requests were generally entered through automated computer systems by personnel at the Geomarket level. After the request was submitted at the Geomarket level, it was automatically submitted for approval to the next level—the Area level. Once approved at the Area level, the request was automatically submitted to D&M personnel in the United States for approval. Once approved by D&M personnel in the United States, the request for the manufacture of the new equipment was transmitted to one of three centers, including the SPC in the United States, where the new tools and other assets were produced. The spending of money for large-scale purchases was authorized once the request was approved by D&M personnel in the United States.

29. CAPEX requests on behalf of D&M operations in Iran and Sudan were routed to D&M personnel in the United States who approved the requests in violation of the ITR and SSR. At times, D&M personnel in the United States approved requests that on their face related to embargoed countries, while at other times D&M personnel in MEA used code words to disguise

---

[2] The CAPEX process applied to expenditures for field technical equipment (sophisticated oilfield drilling equipment) as well as certain non-field technical equipment valued at $5,000 or more (large warehouses and pick-up trucks, etc.).

8

the origin of the request, which D&M personnel in the United States then approved in violation of U.S. law. Approval from D&M personnel in the United States was required for every CAPEX request, including requests submitted by—or for the benefit of—D&M oilfield operations in Iran and Sudan.

30. Although approval was ordinarily sought through D&M's automated computer systems, D&M personnel in MEA at times sent emails to D&M personnel in the United States justifying particular requests and seeking approval for requests submitted by or on behalf of Iran and Sudan. D&M personnel in MEA sent these emails to supplement the CAPEX requests in the automated computer systems. These emails often identified Iran and/or Sudan, through the use of code words. For example, D&M personnel in MEA generally referred to Iran as "Northern Gulf" and Sudan as "Southern Egypt" or "South Egypt" as the requesting location or beneficiary of the funds to be spent. These requests were approved by D&M personnel in the United States even though they were made by or on behalf of Iran or Sudan.

31. For example, in February 2005, a D&M manager in MEA sent an email to D&M headquarters in the United States justifying the business necessity of certain orders for newly manufactured equipment and seeking approval for these requests, at least one of which was made on behalf of D&M operations in Sudan:

> These [three tools] were part of the approved [Sudan] capex.
> Whether you have approved [orders for this type of tool] globally,
> please approve these to support the expanding business in Southern
> Egypt.

32. Similarly, D&M personnel in the United States were asked to approve requests for CAPEX on behalf of D&M operations in Iran. In May 2005, a D&M manager in MEA sent an email to D&M headquarters in the United States stating:

9

> This order is absolutely essential for the future strategy in the "Northern Gulf." You have approved other [requests for similar tools]. Please approve this one too. The strategy was presented to [a senior D&M manager] while he was in Dubai and I believe he is in full agreement that [this particular tool] could be the savior for the "Northern Gulf." Please approve immediately.

33. In some instances, D&M personnel in the United States communicated approval of CAPEX requests for Iran and Sudan via email. In March 2006, D&M operations in Sudan sought approval to spend funds to make improvements to its infrastructure. In an email sent to a D&M manager in MEA, D&M personnel in Sudan justified the request:

> Based on the activity and setup requirement for 2006 in "Southern Egypt," we will need to have the following total $660k [non-field technical equipment] CAPEX in 2006 plan ….

34. The D&M manager in MEA forwarded this request to the United States requesting an approval from D&M personnel in Sugar Land:

> Please give these additional [requests] your approval. This is important for the operations in "Southern Egypt." I have purposely not sent additional files as they refer to "Southern Egypt" by name.

A D&M manager in the United States responded, "Approved …."

35. In June 2006, a D&M manager in MEA sent an email to the United States requesting approval for the purchase of two radiation mud monitors from a company located in the United Kingdom for D&M operations in Iran. A D&M manager in Sugar Land responded, "Approved."

36. In addition, D&M personnel in MEA implemented processes designed to disguise the identity of the embargoed locations in the automated computer systems to facilitate the approval of requests made to support D&M business in Iran and Sudan. These processes were

developed in order to obtain approval from D&M personnel in the United States for requests made by or on behalf of D&M operations in Iran and Sudan in violation of U.S. law.

37. Orders entered into the automated computer system were identified by a series of numbers and letters. Typically, the alpha-numeric identifier included a two or three-letter code indicating the country that made the request.

38. Instead of entering the designated country code for Iran or Sudan, D&M personnel in MEA entered non-embargoed country codes in order to disguise the embargoed locations from D&M personnel in the United States. D&M personnel in MEA also instructed D&M personnel in Iran and Sudan to use these codes when entering requests in the automated computer system. Specifically, the code "BGM," which identified a bonded-goods warehouse in Jebel Ali, United Arab Emirates, was used in place of the Iran country code in order to disguise Iran as the true location and thereby obtain the necessary approval from D&M personnel in the United States.

39. For example, in December 2007, D&M personnel in Iran sent an email to D&M personnel in MEA inquiring about how to enter Iran CAPEX orders into the automated computer system. D&M MEA personnel responded by stating, "Orders are creted [sic] in BGM (Jebel Ali) [buying organization code] as per the Capex plan, since US/European people cannot approve [Iran] orders."

40. While Sudan was part of a Geomarket along with Egypt, Jordan, and Syria, D&M personnel in MEA used the generic Geomarket identifier to represent certain CAPEX requests for Sudan instead of using the Sudan country code. Once Sudan became its own Geomarket, D&M personnel used BGM to disguise Sudan as the true location.

11

41. In a September 2009 email exchange, D&M personnel in MEA revealed the process by which CAPEX orders for Sudan were disguised in order to obtain approval from D&M personnel in the United States: "[A]s discussed, in the past when [Sudan] was under [the Egypt, Jordan, and Syria Geomarket], we used to make non compliant [Sudan] orders under Egypt, we need to discuss how do we need to proceed now …."

42. In some instances, CAPEX orders for Sudan were placed initially using the BGM location code but were reassigned to Sudan after they were approved by D&M personnel in the United States. The purpose behind this process was revealed in an April 2010 email exchange between a D&M manager in Sudan and a D&M manager in MEA:

> Do you need me to place [Sudan] required [CAPEX orders] under Jebel Ali to be reassigned to Sudan after [D&M U.S.-based personnel] approval[?] If I placed them under Sudan, [D&M U.S.-based personnel] wont [sic] be able to approve them…."

The D&M manager in MEA directed the D&M manager in Sudan to enter CAPEX requests for Sudan utilizing the BGM location code.

43. Schlumberger maintained policies and procedures that enforced a strict prohibition on both the export of equipment from the United States to U.S.-sanctioned countries and the transshipment of U.S.-origin equipment to embargoed locations through non-embargoed intermediate countries. To prevent this type of illegal conduct, Schlumberger instituted a "One-Year Rule," a policy that mandated that U.S.-origin equipment located outside of the United States could only be reexported to a U.S.-sanctioned country if it had been in use outside of the United States for over a year.

44. While the One-Year Rule was designed to address transshipments, it was insufficient in preventing other illegal conduct and D&M personnel designed methods to evade

12

the One-Year Rule. For example, when an approved CAPEX request from Iran or Sudan resulted in the manufacture of equipment at SPC in the United States, D&M personnel in MEA utilized a special process—commonly referred to as a "swap" in company emails—to supply U.S.-origin equipment to these embargoed locations.

45. In a "swap," personnel in MEA arranged for a tool to be shipped from the United States to a non-embargoed location and simultaneously caused a tool to be shipped from the non-embargoed location to Iran or Sudan. Once the particular piece of equipment was manufactured, D&M personnel in MEA identified a non-embargoed location that already had the identical piece of equipment in use. D&M personnel in MEA then directed SPC to ship the new equipment to the non-embargoed location. The non-embargoed location would maintain its used equipment in service until the new equipment from SPC arrived. Once the new piece of equipment from SPC was received, the non-embargoed location would replace its used U.S.-origin equipment with the new equipment and then ship the used equipment to Iran or Sudan.

46. The process of a "swap" was specifically designed to comply with company policy requiring U.S.-origin equipment being reexported to embargoed locations to have been in use outside the United States for over one year, while at the same time facilitating the supply of U.S.-origin equipment to D&M oilfield operations in Iran and Sudan in violation of the ITR and SSR.

47. For example, in February 2008, a newly manufactured tool from SPC in Texas was shipped from the United States to BGM in order to facilitate a swap for the benefit of D&M operations in Iran. Upon notification that the tool was shipped from Texas, D&M management in MEA coordinated with D&M personnel in Iran: "It was brought in for [Iran.] Notify [D&M manager in Iran] to organize a swap with [another Geomarket]."

b

48. In March 2005, D&M personnel working on behalf of Sudan coordinated a swap with D&M personnel in Indonesia for a newly manufactured tool from SPC. A D&M manager in Sudan sent an email to a D&M manager in Indonesia stating:

> Reference to our telephone conversation regarding [the tool] swap, this tool is now available to be shipped from SPC, please can you provide location details so we can advise shipping instructions to SPC. We will need one year older tool in return ....

The D&M manager in Indonesia forwarded the email to other D&M personnel working in Indonesia informing them of the plan to swap tools: "This is to help out Sudan again with their embargo. We will receive this tool first ... and send out one year old tool ...."

### D&M Headquarters Involvement in Iranian Operations

49. Schlumberger stationed essential D&M personnel in the United States with knowledge that D&M provided services in Iran and Sudan. Despite this knowledge—and the fact that many of the D&M employees located in the United States were non-U.S. citizens with little or no prior exposure to U.S. sanctions laws but nonetheless were U.S. persons as defined by the ITR and SSR—Schlumberger failed to provide these individuals with adequate training regarding U.S. sanctions, failed to instruct them to recuse themselves from any embargoed country business, and failed to address the reality that, as part of their job responsibilities, they would be asked to make decisions about issues arising in or regarding Iran and Sudan. As a result, on certain occasions, D&M personnel in the United States made and implemented business decisions involving D&M operations in Iran.

50. Specifically, at times, senior D&M management and other D&M personnel in the United States actively engaged in the management of business operations in Iran, and took certain steps to maximize the efficiency and profitability of D&M operations in Iran. For example, a senior D&M manager in the United States received an email originating from a D&M

14

manager in Iran that sought assistance in expediting the delivery of newly manufactured oilfield drilling tools from the SRPC in France to Iran. Specifically, this email stated:

> Bottom line is we have an aggressive revenue plan for [this year] with no sand bagging, late delivery of equipment will severely diminish our chances to make the plan. Any help in getting SRPC to deliver would be much appreciated.

Upon receiving this email, this senior D&M manager directed another D&M manager in the United States to "check up with SRPC, get the **confirmed delivery dates** stating that this is urgent and get back to me" (emphasis in original).

51. Once it was apparent that SRPC would not be able to deliver the tools in time to meet the requirements of D&M in Iran, a D&M manager in the United States requested financial information from Iran to assess whether to redeploy tools from D&M oilfield locations in Canada to meet the increased demand in Iran. The D&M manager in the United States said, "This is going to have to come down to a revenue call. Please reply with clients, revenue and duration so that we can make a HQ decision." In response, D&M personnel in Iran identified two contracts: (1) a two- to three-year contract in support of the National Iranian Oil Company ("NIOC")[3] worth $20 million, and (2) a two-year contract in support of Company A worth $22 million.

52. The next day, a D&M manager in MEA sent an email to the senior D&M manager specifically requesting the redeployment of tools from Canada to Iran to support the NIOC and Company A contracts. The justification for the request was based on two metrics— tool utilization, and revenue generation per tool:

---

[3] In September 2012, pursuant to the Iran Threat Reduction and Syria Human Rights Act of 2012, the Department of the Treasury determined that NIOC is an agent or affiliate of Iran's Islamic Revolutionary Guard Corps and therefore, NIOC's property or interests in property are blocked pursuant to IEEPA.

> We have demonstrated that the redeployment of tools to Northern Gulf for NIOC 3 rig mob[ilization] and upcoming [Company A] 2 year contract Kharg Island and NIOC meet both these criteria and exceed the hurdle rate.

Later that month, the tools were shipped from Canada to MEA to support D&M operations in Iran.

53. On another occasion, a senior D&M manager sent an email to D&M managers at the Areas to express disappointment regarding business performance in various locations. This senior D&M manager identified specific locations that needed particular attention and stated "we are now at the stage where I would like to get involved in the details of each [Geomarket]." The senior D&M manager instructed the relevant D&M personnel to participate in a conference call to address "the action being taken and the outlook" for each of the Geomarkets he identified—one of which was Iran.

54. Later that month, the conference call was held to review the business performance of D&M operations in Iran. In advance of the conference call, D&M personnel in MEA sent several slides to guide the review. According to the slides, business activity in Iran was lower than expected, in part, due to "delay in getting tools." Among the "Action Items" listed in the slides was "[h]elp with embargo related issues."

55. On another occasion, a senior D&M manager contacted SHTC management personnel in the United Kingdom, at the request of D&M personnel in Iran, in order to expedite the processing of orders originating from Iran for new oilfield equipment. A D&M manager in MEA sent an email to that senior D&M manager which included a message originating from another D&M manager in MEA. The original email to the D&M manager in MEA contained a subject line which read "Bullet Points for [the senior D&M manager]" and stated in part: "Inventory in SHPC [in the United Kingdom] and SRPC [in France] we need [HQ] directive to

16

make it happen. Our embargo countries future activity and NET is dependant [sic] on this." The D&M manager in MEA reiterated this by stating to the senior D&M manager, "inventory and swapping of motors is killing us in the Northern Gulf we are stoking a big bonfire which is about to become an inferno. We need SHPC to become exceptionally proactive very quickly re motor parts etc ...."

56. In a separate email to the same senior D&M manager, the D&M manager in MEA again requested help from the senior D&M manager with orders for new oilfield drilling equipment placed with SHTC for Iran. The senior D&M manager discussed these concerns with other D&M personnel in the United States and then reached out to management at SHTC in the United Kingdom to follow-up on the concerns raised by D&M personnel in Iran and MEA.

57. Later that month, D&M held a financial planning meeting in Houston, Texas, to discuss global financial expectations for the upcoming year and to establish a plan to meet those expectations. D&M headquarters personnel and business managers attended this meeting. According to the minutes of the meeting, which were widely distributed throughout D&M, a senior D&M manager identified a few Geomarkets where business activity was not meeting expectations— specifically, Iran was among the Geomarkets identified by the senior D&M manager as "GeoMarkets we have to focus on immediately ...."

**United States Persons Providing Technical Services to Support Embargoed Locations**

58. Schlumberger maintained repair facilities outside the United States that were equipped to service D&M tools and staffed these facilities with trained non-U.S. person technicians. In some cases however, the best source for technical support was the product center (often SPC) that manufactured the tool and the replacement components necessary to sustain the safe and efficient operation of the tool. On several occasions, D&M personnel acting on behalf

17

of operations in Iran and Sudan, contacted U.S. persons for assistance. On these occasions, U.S. technical specialists provided support even though they knew or should have known that the request originated from a U.S.-sanctioned country.

59. For example, D&M personnel in SPC provided technical services related to the testing of "mud," a substance used to lubricate drilling equipment while in operation, taken from oil wells in Sudan. Lengthy email exchanges between D&M personnel in SPC and D&M personnel working on behalf of operations in Sudan detail explicitly the technical services rendered in order to troubleshoot equipment failures suspected to have been caused by the poor quality of mud. Throughout the email exchanges, the term "Southern Egypt" was used as a substitute for Sudan.

60. D&M personnel worldwide were required to seek and obtain specific authorization to deviate from certain standard product usage specifications. For especially significant or challenging deviations from the standard specifications, approval was required from D&M management personnel in Sugar Land, Texas. From time to time, such approval requests were made from D&M oilfield locations in embargoed countries.

61. For example, in November 2004, D&M personnel in Sudan were experiencing difficulty utilizing a particular tool due to the composition of soil in the oil well. To help resolve this issue, D&M personnel in Sudan sought approval to utilize two separate tools in combination to troubleshoot the problem. D&M personnel in the United States approved the request from Sudan to utilize the particular tool combination.

### Schlumberger's Withdrawal from Iran and Sudan

62.     In 2009, in consultation with the U.S. Department of State, Schlumberger agreed to no longer pursue new oilfield contracts in Iran. In 2011, Schlumberger voluntarily decided to cease providing oilfield services in Iran. As of June 30, 2013, Schlumberger ceased providing oilfield services in Iran.

63.     In 2011, Schlumberger also voluntarily agreed to cease providing oilfield services in the Republic of Sudan ("North Sudan"). As of the date of the Plea Agreement, Schlumberger ceased providing oilfield services in North Sudan.

## DEFENDANT'S ACCEPTANCE OF STATEMENT OF OFFENSE

I am authorized to act on behalf of Schlumberger Oilfield Holdings, Ltd. in this matter. I have read this Statement of Offense and have discussed it with counsel, Barry M. Sabin, Esquire. I am fully satisfied with the legal services provided by Mr. Sabin. I understand all of the statements included in this Statement of Offense and voluntarily agree that the statements included in the Statement of Offense are factually accurate. No threats have been made to me or Schlumberger Oilfield Holdings, Ltd., nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

DATE: 25 March 2015         _____
                             Authorized Representative of Schlumberger Oilfield Holdings, Ltd.